**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| HANDEX OF MARYLAND, INC., | * | |
| Plaintiff, | * | |
| v. | * | |
| WASTE MGMT. DISPOSAL SERVICES OF MARYLAND, INC., | * | |
| Defendant, | * | |
| v. | * | |
| GREAT AMERICAN INS. CO., *et al.* | * | Civil Action No. AW-05-1044 |
| | * | AW-05-2584 |
| Third-Party Defendants. | * | |
| ****************************************** | | |
| STRITTMATTER CONTRACTING, LLC, | * | |
| Plaintiff, | * | |
| v. | * | |
| GREAT AMERICAN INS. CO., | * | |
| Defendant. | * | |
| ************************************************************************* | | |

**MEMORANDUM OPINION**

      Currently pending before the Court is Great American Insurance Company's Motion for Clarification of Court's Order [39]. Great American Insurance Company ("Great American" or "Surety") has asked this Court to allow it, as a surety, to prosecute the claims of Handex of Maryland, Inc. ("Handex" or "Contractor") against Waste Management Disposal Services of Maryland, Inc. ("Waste Management" or "Owner"). This consolidated action presents the question

1

whether an assignment clause in a construction indemnity agreement creating a suretyship prevails over a nonassignment clause in the general contract between the Owner and Contractor. The Court has reviewed the parties' pleadings and oral arguments on the motion. An opinion will now issue.

## FACTUAL AND PROCEDURAL BACKGROUND

Waste Management, as Owner, contracted with Handex, as general contractor, for the capping of the municipal waste disposal site at the Sandy Hill Creative Disposal Project (the "Project") in Bowie, Maryland. Great American issued payment and performance bonds assuring the obligations of Handex arising under its contract with Waste Management. Handex subcontracted to Strittmatter Contracting LLC ("Strittmatter") the earthwork portion of the scope of work. The subcontract required Strittmatter to perform work under the plans and specifications issued by Waste Management under the general contract. It also included provisions which limit Strittmatter's rights of recovery for extra work and claims to those monies recovered from Waste Management.

Work began at the Project on April 29, 2003 and the original project schedule called for completion within 385 calendar days. On January 14, 2005, when the project was over ninety percent complete, Waste Management terminated its contract with Handex. Handex then terminated its subcontract with Strittmatter on January 17, 2005. On April 15, 2005, Handex filed this action against Waste Management for damages relating to the project. Specifically, Handex alleges that Waste Management breached the contract by failing to pay for contract work and extra work, providing defective specifications, refusing to grant time extensions and by wrongfully terminating the project. On the other hand, Waste Management counterclaims for breach of contract alleging that Handex, through its subcontractor Strittmatter, failed to comply with the contract requirements, delayed the work and was properly terminated for default. Waste Management has joined Great American as a third party defendant for Great American's refusal to complete Handex's work once

the contract was terminated.

On November 23, 2005, Handex filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. On December 19, 2005, this Court informed the parties that it was "inclined to administratively close this case" until the Bankruptcy Court lifts the automatic stay. On January 10, 2006, the Court issued an order stating that the automatic stay does not apply to Waste Management's third party claims against Great American. On February 10, 2006, the Court clarified its order that fourth party claims by Great American were not subject to the automatic stay and could proceed. Thereafter, Great American served its Complaint on the Fourth Party Defendants. Great American based those claims under an Indemnity Agreement dated January 15, 2002, which was executed as part of Great American's surety relationship with Handex. The Indemnity Agreement contains a clause that assigns to Great American all contract rights, claims and actions that Handex may have in the event of "a breach or alleged breach" or "a default or an alleged default." In March 2003, however, Great American entered into a performance bond agreement and a payment bond agreement with Waste Management. The bond agreements incorporated the Handex–Waste Management contract, which contained an express prohibition against Handex making any assignment of its rights against Waste Management without Waste Management's prior approval.

On September 21, 2006, Handex's bankruptcy proceedings were terminated, subject to a 20-day objection period. The termination Order became effective by operation of law on October 11, 2006 at the conclusion of the objection period.

## ANALYSIS

In its January 10, 2006 Order, the Court stated that the Handex bankruptcy stay did not apply to Waste Management's third party claims against Great American. Great American now claims that it owns Handex's affirmative claims and seeks clarification from the Court as to whether the

3

Court's January 10 Order precludes Great American from pursuing the affirmative claims Handex has against Waste Management. The termination of Handex's bankruptcy proceedings does not moot Great American's request because Great American still wishes to prosecute Handex's affirmative claims even though bankruptcy proceedings have ended. In support of its position, Great American argues that the January 15, 2002 Indemnity Agreement between Great American and Handex assigned to Great American all contract claims and actions that Handex may have in the event of a breach or default. Great American directs the Court to two particular provisions of the Indemnity Agreement:

### ASSIGNMENT

THIRD: The Undersigned hereby consenting, will assign, transfer and set over, and do hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Undersigned to the Surety, whether heretofore or hereafter incurred, the assignment to become effective retroactive to the date of the first Bond, but only in the event of (1) any abandonment, forfeiture or breach or alleged breach of any contracts referred to in the Bonds or of any breach or alleged breach of any Bonds; or (2) of any breach or alleged breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default or alleged default in discharging such other indebtedness or liabilities when due; …(a) All the rights of the Undersigned in, and growing in any manner out of the Bonds or any contracts referred to in the Bonds; …(d) All actions, causes of actions, claims and/or the proceeds therefrom and any demands whatsoever which the Undersigned may have or acquire against any party, including but not limited to owners, obligees,…in connection with or on account of any and all contracts referred to in the Bonds;…(e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the bonds and all other contracts whether bonded or not in which the Undersigned has an interest; (f) any and all accounts receivable…

### ATTORNEY IN FACT

NINETEENTH: The Undersigned hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Undersigned assigned, transferred and set over to the Surety in this Agreement, and in the name of the Undersigned to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full

4

>   protection intended to be herein given to the Surety under all provisions of this Agreement. The Undersigned hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

(Mot. for Clarification of Court's Order Ex. E). Waste Management challenges Great American's position asserting that an anti-assignment clause in the general contract between Handex and Waste Management prohibited Handex from assigning any rights under the contract without Waste Management's prior approval. The anti-assignment clause reads as follows:

> 7. Assignment
>    A. Contractor may not assign or subcontract any portion of the Work, right to payment or any terms or conditions of the Contract Documents without the prior written approval of Owner. The parties agree that there are no third party beneficiaries to this Contract.
>    B. No assignment, transfer, or subcontract, even though consented to, shall relieve Contractor of its obligations, responsibilities and liability under the Contract Documents.
>    C. Should any assignee fail to perform the Work undertaken by it in a proper manner, Owner may, at Owner's option, require Contractor to terminate such assignment.
>    D. Owner may, in its sole discretion, freely assign this Contract to any of its parent, subsidiary or affiliated companies or any other individual or entity.

(Resp. to Mot. for Clarification of Court's Order Ex. 4). Waste Management argues that the Indemnity Agreement assignment predates the general contract; therefore, at the time the Indemnity Agreement was executed, Handex had no claims to assign. Consequently, Waste Management argues, the assignment is void and unenforceable. In order to properly resolve the conflict between these two competing agreements, the Court looks first at the relationship of the parties.

The Surety Relationship

A surety is the result of a three party agreement. This relationship has been described as a "direct and original undertaking." *General Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1309 (Md. 1985). Here, the tripartite relationship is among Handex (as Contractor and principal),

5

Great American (as Surety), and Waste Management (as Owner and obligee). "Under the tripartite suretyship relationship, a bond surety is often called upon to balance the claims of an obligee under a performance bond against the protests of the principal that it did not in fact default. This has sometimes been called the surety's classic dilemma." *Associated Indem. Corp. and Fireman's Fund Ins. Co. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 281-82 (Tex. 1998) (internal quotations omitted). In this case, Great American's dilemma is exacerbated by the subsequent anti-assignment clause within the Handex–Waste Management general contract.

Anti-Assignment Clauses

The parties do not dispute that the contracts in this case are governed by Maryland law. It is also undisputed that anti-assignment clauses have been held valid by Maryland courts. *Ratta v. Larkin*, 856 A.2d 643, 652-653 (Md. 2004) (holding that purported assignment in violation of anti-assignment provision of partnership agreement was invalid and unenforceable); *Pub. Serv. Comm'n v. Panda-Brandywine, L.P.*, 825 A.2d 462, 472 (Md. 2003) (holding that alleged "back to back" resell agreement was in fact an assignment in contravention of an anti-assignment provision and therefore invalid and unenforceable); *Clay v. Gov't Employees Ins. Co.*, 739 A.2d 5 (Md. 1999) (affirming judgment for insurer and against purported assignee of insured where insurance policy provided that assignment of interest under policy without insurer's consent would not bind insurer).

The question, though, is whether an anti-assignment clause strictly forecloses the application of *any* assignment outside of the anti-assignment clause's provisions. More specifically, the question is whether, in the construction industry, such a clause trumps the typical assignment clauses in indemnity agreements. *See Bell BCI Co. v. Old Dominion Demolition Corp.*, 294 F. Supp. 2d 807, 808 (E.D.Va. 2003) (explaining that sureties typically include assignment and attorney-in-fact clauses). Unfortunately, there is a paucity of case law directed at this particular question.

Interpretation of the Competing Contracts

At oral argument, Waste Management urged the Court to look only at the plain language of the Handex–Waste Management contract. The Court would have no issue confining its inspection to the unambiguous, plain language of the anti-assignment clause had the anti-assignment not been in direct conflict with the equally unambiguous, plain language of the Indemnity Agreement's assignment and attorney-in-fact clauses. Waste Management may be entitled to enforce the provisions of its agreement with Handex. However, the "surety is [also] entitled to stand upon the letter of his contract." *Fidelity & Deposit Company of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983). Therefore, this Court must objectively interpret the two contracts *sub judice* from the standpoint of what a reasonable person in the position of the parties would have meant at the time the agreements were signed. *See Daniels*, 492 A.2d at 1310. In addition, the Court must construe the agreements in such a way as to effectuate their general purpose. *Kelly Constr. Co. v. Washington Suburban Sanitary Comm'n*, 230 A.2d 672 (Md. 1967).

Great American contends that as a matter of routine practice and tradition in the construction industry, corporate sureties do not issue bonds making themselves liable for a contractor without indemnity agreements in place, and indemnity agreements typically contain assignment and attorney-in-fact clauses. As a result, Waste Management should be aware of the established customs and practices of the industry, especially the standard terms of the indemnity agreement. In essence, Great American argues that by entering into the payment and performance bond agreements with Great American, Waste Management impliedly approved of the terms of the indemnity agreement already in place—one of those terms being the assignment of rights to the surety. Great American directs the Court to two cases in which Maryland courts have narrowly construed some anti-

7

assignment clauses to permit assignments *related* to the original transactions. *See Crown Oil & Wax Co. of Del., Inc. v. Glen Constr. Co. of Va., Inc.*, 578 A.2d 1185 (Md. 1990); *Ruberoid Co. v. Glassman Constr. Co.*, 234 A.2d 875 (Md. 1967).

In the *Crown Oil* case, a corporation that owned a piece of property later assigned the property and a related construction contract to a syndicate controlled by the owners of the corporation. The nonassignment clause in the construction contract was held by the court not to prohibit the assignment to the syndicate. The court reasoned that there was no detriment or prejudice to the other party since the original owner remained liable. Also, the court noted that the syndication was a common, anticipated possibility that experienced parties, such as those, could not have intended to preclude. 578 A.2d at 1195.

Since all the parties to this tripartite surety relationship are sophisticated participants in the construction industry,[1] the Court cannot review these agreements in a vacuum, but must anchor its interpretation within the context of the construction industry. The parties have not cited any cases directly on point, but the *Old Dominion* case cited by Great American provides a good analogy. *See Bell BCI Co. v. Old Dominion Demolition Corp.*, 294 F. Supp. 2d 807 (E.D.Va. 2003). In that case, the surety issued both a performance bond and a payment bond on behalf of a subcontractor. The subcontractor, in turn, executed an indemnity agreement with the surety, under which the subcontractor assigned its rights to the surety in the event of a default. One of the assigned rights was the right to settle the subcontractor's affirmative claims against the contractor. The subcontractor argued that the ability of the surety to settle its claims was barred by the

---

[1] In its Annual Report filed with the Securities and Exchange Commission, Waste Management claims to be the largest environmental services company in North America.

subcontractor's failure to receive written approval from the contractor of any assignment of rights to the surety. *Id.* at 812. However, the contractor never objected to the assignment or in any way asserted the nonassignment clause. The subcontractor, instead, attempted to assert the nonassignment clause. The court held that the anti-assignment posed no bar to the surety's ability to settle the subcontractor's claims, reasoning that the contractor alone, not the subcontractor, had standing to object to the absence of the contractor's approval. *Id.* Another factor in the court's analysis was the fact that the contractor "was at all times aware of the [s]urety; indeed the [contract] required [the subcontractor] to furnish [the contractor] performance and payment bonds through an acceptable surety." *Id.* at 813.

In *CAT Contracting*, a similar issue was before the court. 964 S.W.2d 276. In that case, the contractor contracted with the owner to construct eight miles of concrete pipeline. *Id.* at 278. The contractor secured payment and performance bonds from the surety. The surety named the owner as obligee under the bonds, and the contractor agreed to indemnify the surety for any losses the surety incurred under the bonds. *Id.* In the indemnity agreement between the surety and the contractor, the contractor assigned to the surety "any contractual claims it might have had against [the] Owner as collateral security for [the] Contractor's indemnity obligation." *Id.* at 282. The court held that this assignment provision gave the surety the right to settle claims the contractor had against the owner. The court did not address any issues relating to a nonassignment clause.

The tripartite surety relationship in the present case differs from that in the *Old Dominion* case only in the fact that the relationship here is among contractor, surety, and owner, rather than subcontractor, surety, and general contractor. The surety relationship in the *CAT Contracting* case was identical to the relationship in the present case. In both cases, the court allowed the surety to

9

settle the claims of the assignor under an indemnity agreement. If a surety/assignee is allowed to *settle* the claims of an assignor, then it follows that the surety must be able to also prosecute those claims. The primary distinction in the *Old Dominion* case, however, is that the general contractor—the only party with standing to object to the assignment—apparently did not assert the nonassignment clause. The court disposed of the issue on those grounds. In the case *sub judice*, Waste Management has indeed asserted the nonassignment clause. Because the *Old Dominion* court did not address what would happen if the obligor of the nonassignment provision contested the assignment, the question remains unanswered.

In dicta, the *Old Dominion* court gave consideration to the fact that the contractor was aware of the surety and actually required the subcontractor to obtain a surety. 294 F. Supp. 2d at 813. Here, Great American makes a similar argument, positing that the anti-assignment clause in the Handex–Waste Management agreement was intended to prevent a stranger to the transaction from taking over the rights or duties of the Contractor without the Owner's approval. The Court agrees with Great American. In this case, Great American was far from a stranger to the dealings between Handex and Waste Management. In fact, Waste Management was aware of Great American's involvement from the very beginning and throughout the duration of the Sandy Hill construction project ordeal. Waste Management is also keenly aware of the routine practice of contractors and sureties in the construction industry. Under that backdrop, the Court believes that a reasonable person in the position of the parties to this three-way relationship would understand the nonassignment clause to be inapplicable to Great American as Handex's surety. As such, the nonassignment clause does not bar the assignment of Handex's claims to Great American.

The Court must now address the temporal argument raised by Waste Management at oral

10

argument. Waste Management argues that the assignment is invalid because the indemnity agreement which purported to assign Handex's claims to Great American was executed in 2002, well before Handex entered into the construction agreement with Waste Management and before Handex had any rights or claims to assign. In *Gray v. Travelers Indem. Co.*, 280 F.2d 549 (9th Cir. 1960), the Ninth Circuit addressed this very issue. In that case a subcontractor was hired to perform work on a construction project. A surety provided a bond on behalf of the subcontractor, which included a provision for the assignment of sums due under the contract upon the subcontractor's default. The subcontractor subsequently executed other assignments of the contract proceeds for debts owed. After the subcontractor defaulted on the construction contract, the surety and subsequent assignees sought clarification as to who was legally entitled to the contract proceeds. On the temporal issue relating to the assignments, the court noted:

> [t]here is a split in authority as to whether a conditional assignment takes place as of the time the condition occurs or as of the time the assignment is made. In the first [line of] cases, the court held that an assignment to the surety conditioned on a default by the principal was effective as to the other assignees only as of the date of the default. In the [second line of] decisions the assignment was deemed effective as of the time the surety's bond was executed. This we think is the better view. On the date of the assignment given priority in the first group of cases mentioned above, the contract which was to produce the fund assigned had not been completed. Since the assigned fund was not yet in existence, the implicit condition that there be such a fund had not then been satisfied. Every assignment of funds to become due under a contract is conditional upon some degree of performance by the assignor, and assuredly the condition of default renders the assignment no less certain than does the condition of performance. By a parity of reasoning, if the condition of performance has no bearing on the date the assignment becomes effective, the condition of default should be similarly irrelevant.

*Gray*, 280 F.2d at 554-55 (internal citations omitted). The court ultimately held that "the general indemnity agreement must be construed as an assignment, as of the date when [the surety's] bond for the [construction project] was issued." *Id.* at 554.

11

While this Court is not bound by Ninth Circuit precedent, the Court finds the reasoning in *Gray* persuasive. On January 14, 2005 Waste Management issued a notice to Handex terminating the construction contract for default. Handex disputed the termination as improper, and in April 2005 sued Waste Management for wrongful termination. Waste Management then filed its counterclaims against Handex in June 2005. The assignment provision in the Indemnity Agreement was conditioned upon some triggering event, such as breach or default under a contract secured by a future bond agreement. Here, the above series of events occurred *after* the Handex–Waste Management agreement was executed, and triggered Great American's rights under the Indemnity Agreement. Those rights became complete retroactive to the date Waste Management entered into the bond agreements with Great American. If the Court reads the assignment and nonassignment provisions in such a way as to effectuate the parties' intentions, then it is clear that once the contract between Handex and Waste Management collapsed, Great American immediately became entitled to step into the shoes of Handex and assert any rights and claims Handex may have had.

<u>Great American's Right of Subrogation</u>

Because the issues raised by Great American's motion can be disposed of without reaching the question of subrogation, the Court will discuss the issue only briefly here. In *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962), the Supreme Court held that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." 371 U.S. at 136-37. The Fourth Circuit has explained that the right to subrogation arises only after actual payment of a debt.

> Unless the surety pays the debt in full, he is not entitled to subrogation, and until this is done the creditor will be left in full possession and control of the debt and the remedies for its enforcement. It must not be enforced to the detriment of equal or superior equities existing in other parties, nor where its enforcement would operate to the prejudice or injury of the creditor, and cannot, therefore, be insisted upon until

12

the creditor is fully paid and satisfied.

*Maryland Cas. Co. v. Fouts*, 11 F.2d 71, 74 (4th Cir. 1926). The question here is whether Great American has made any actual payments or whether its losses are only potential losses. Waste Management argues that by refusing to honor the performance bond, Great American lost its right to be equitably subrogated to Handex's rights. Great American contends that it is equitably subrogated to Handex's rights because it made payments under the payment bond. In *Pearlman*, the surety's claim for reimbursement arose out of the payments made pursuant to the payment bond. The fact that Great American did not complete the work under the performance bond is of no consequence to its right of subrogation under the payment bond. Great American has been paying claimants under the payment bond and these losses and related expenses exceed $361,572 in claims and $151,004 in related expenses, for a total actual loss of more than $512,516. (Reply to Resp. to Mot. for Clarification of Court's Order Ex. 9). Because Great American has paid out under the payment bond, it should, in equity be subrogated to Handex's right to claims against Waste Management.

Finally, the Court believes it pertinent to say something about the nature of subrogation. Subrogation is an equitable remedy. It allows the Court to do that which ought to be done. In the present case, equity demands that Great American be allowed to pursue Handex's claims against Waste Management. At the time Waste Management entered into its agreement with Handex, Waste Management knew of Great American's presence and of Great American's surety relationship with Handex. Waste Management is a frequent player in the construction industry, and is cognizant of the fact that the surety relationship includes a conditional assignment of the contractor's rights to the surety. Under these facts, it flies in the face of equity to, on one hand, allow Waste Management

to pursue its claims against Great American, and, on the other hand, block Great American's claims against Waste Management. Therefore, the Court finds that Great American is equitably subrogated to Handex's rights under the Handex–Waste Management agreement.

## **CONCLUSION**

The Court holds that as between the assignment clause in Great American's 2002 Indemnity Agreement with Handex and the anti-assignment clause in Waste Management's 2003 construction contract with Handex, the Indemnity Agreement assignment is not subject to the nonassignment provision of the Handex–Waste Management agreement. At the time of breach or default under the Handex–Waste Management agreement, Handex's assignment to Great American of all its rights and claims under the contract became effective. Therefore, Great American may step into the shoes of Handex and pursue Handex's affirmative claims against Waste Management under the Handex–Waste Management agreement. For the reasons stated above, the Court GRANTS Great American's Motion for Clarification. An Order consistent with this opinion will follow.

| | |
|---|---|
| November 1, 2006 | /s/ |
| Date | Alexander Williams, Jr.<br>United States District Judge |